SilvermanAcampora LLP
Proposed Counsel to the Debtor and Debtor in Possession
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Gerard R. Luckman, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE:

THE WOODCREST CLUB, INC.,            Chapter 11
                                                      Case No.   09-79481 (DTE)

                       Debtor.
------------------------------------------------------------X

**EMERGENCY APPLICATION FOR ORDERS (1) AUTHORIZING THE
DEBTOR TO INCUR POST PETITION FINANCING, ON AN INTERIM BASIS,
WITH SUPERPRIORITY OVER ADMINISTRATIVE EXPENSES AND SECURED
BY JUNIOR PRIORITY LIENS PURSUANT TO SECTIONS 105(a) and 364(c) OF
THE BANKRUPTCY CODE, (2) SCHEDULING A FINAL HEARING AND
ESTABLISHING NOTICE REQUIREMENTS PURSUANT TO BANKRUPTCY
RULES 2002, 4001 AND 9014, (3) APPROVING THE DEBTOR'S INTERIM
<u>MANAGEMENT AGREEMENT, AND (4) GRANTING RELATED RELIEF</u>**

TO:    THE HONORABLE
        UNITED STATES BANKRUPTCY JUDGE
        FOR THE EASTERN DISTRICT OF NEW YORK:

This emergency application (the "Application") of The Woodcrest Club, Inc. ("Debtor") respectfully represents:

**<u>THE EMERGENCY</u>**

1.    The Debtor is a non-profit member-owned country club operating an 18 hole golf course with a club house, swimming pool, employees' residence and maintenance/equipment buildings. The Debtor's real property consists of approximately 107 acres in the Village of Muttontown, New York. An area which is zoned for single family homes on 3 acre parcels. A "land only" appraisal of the Debtor's real property conducted in June 2008 yielded an appraised value of $28.0 million dollars.

2.    In or about May, 2006 the Debtor entered into that certain Amended, Restated and Consolidated Mortgage Note (the "Mortgage") by and between the Debtor as Mortgagor

and Time Insurance Company ("Time") as Mortgagee. The Debtor owes approximately $6.5 million dollars under the Mortgage. Despite all of its equity in its assets, the Debtor found itself severely constrained for cash. Under the Mortgage, the Debtor is precluded from further encumbering the property or borrowing money other than ordinary trade credit. Further, if the Debtor were to refinance the property in order to allow it to draw from its substantial equity in the property, the Mortgage contains a prepayment penalty in the form of a "yield maintenance provision" which has the effect of adding approximately 20 to 25% to the principal amount to be paid upon a refinancing or other early termination of the Mortgage.

3. As a result of the onerous provisions of the Mortgage which, absent equitable relief, preclude the Debtor from obtaining additional financing for working capital, the Debtor's ability to continue to operate as a club was called into question by its members. Many members have already left the club and joined other facilities leaving the Debtor incapable of fully sustaining operations with the singular source of funds being the dues paid by its remaining members.

4. By letter dated November 10, 2009 (the "Letter of Intent"), the Debtor entered into a letter of intent with John Bennardo, a member of the club and former member of its board of directors, with for the purpose of providing a framework under which Mr. Bennardo would, through a related entity, Legacy Capital Management, Inc.[1] ("Legacy"), manage the day to day operations of the club while the Debtor's bankruptcy case proceeds and the approval by the Debtor's membership of a final management agreement. In the meantime, the club will need to continue to operate in order to wind down this season, host several events over the winter, and prepare for next year's season. A copy of the Letter of Intent is annexed to the Credit Agreement as Exhibit C. The Letter of Intent was approved by its board of directors, after discussion of its contents with non-board members of the club. The parties are working on a

formal management agreement, but such agreement may not be finalized prior to obtaining final approval of DIP financing. The Debtor intends to seek membership approval of a final management agreement subsequent to final approval of this DIP financing. Regardless, the day to day operations of the club must be maintained in order to preserve value, and the Debtor submits that operating under the Letter of Intent in the interim is the most cost-effective and necessary manner in which to proceed. Additionally, authority to operate under the Letter of Intent on an interim basis is a preconditions to lending money under the DIP facility for which approval is being sought herein.

5. Given the magnitude of the Debtor's obligations, the various immediate pressures of maintaining adequate cash flow and working capital to operate the Debtor's business with the greatly reduced dues revenue, the Debtor is constrained to obtain debtor-in-possession financing and offer its lender the protections available under the Bankruptcy Code. This will afford the Debtor the ability to sustain operations until either the consummation of the Management Agreement which provides for continued financing, or if the Management Agreement is not approved, the sale of the Property to the highest and best bidder via a bankruptcy court authorized public auction.

### **THE MANAGEMENT AGREEMENT**

6. In order to limit the amount of financing needed and to provide members and prospective members with the confidence that their dues will be sufficient to sustain service levels and operations, the Debtor needs to restructure how the club is managed. Aware of the Debtor's current liquidity problems, members and prospective members may be reluctant to join for the next season out of concerns regarding reduced service levels or the leveling of large assessments against the members to sustain operations. The Management Agreement and availability of financing should alleviate these concerns.

---

[1] The Letter of Intent referes to the management company as Manageco. Upon information and belief, subsequent to entering into the Letter of Intent, Bennardo formed Legacy for use as the contemplated management company

7. The salient terms of the Letter of Intent are as follows:

1) Legacy will be the club manager on an interim basis pending the approval of a final Management Agreement by the Debtor's members;

2) Legacy's responsibility as interim club management will terminate upon the earlier of:

   (a) the members declining to approve the final Management Agreement;

   (b) the Court declines to approve the final Management Agreement (providing such approval is even necessary).

3) If the Debtor rejects the Management Agreement, Legacy is entitled to reimbursement of legal, accounting and other diligence expenses in the amount up to $50,000;

4) Legacy must operate the club as a Golf Club in a style and manner that will provide the quality, amenities and performance levels equal to or better than the members have historically enjoyed;

5) Initial Management Term is 5 years, the final agreement will contain renewal provisions;

6) Management fee of $250,000 per annum;

7) Excess revenue will be used first to pay down the DIP financing, second to the purchase of capital assets or improvements and last to be shared as a bonus to Legacy and a cash reserve for operations.

8. The Debtor believes entering into the Management Agreement, on an interim basis, pending member approval is in the best interest of the Debtor and its creditors as it allows the Debtor to sustain operations and status quo while the Debtor focuses on the long-term management of the club.

---

entity.

## SUMMARY OF RELIEF REQUESTED

9. The Debtor requires emergency debtor-in-possession financing, provided pursuant to Section 364 of Title 11, United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), to enable it to sustain operations while it explores various options for the restructuring of the club. The Debtor's operations require sufficient levels of working capital to fund and support ordinary business expenditure, including payroll, debt services on the Mortgage, expenses for security, maintenance, utilities, taxes and other necessary overhead costs.

10. Absent access to emergency financing, the Debtor will not have sufficient liquidity to continue providing necessary member services, resulting in further loss of membership and causing immediate irreparable harm to the Debtor's creditors and estate. Implementation of the post-petition financing arrangements summarized herein is critical to avoid immediate and irreparable harm to the estate, and to support the Debtor's effort to maximize the estate for the benefit of all creditors and parties-in-interest.

11. Accordingly, by this Application, the Debtor seeks entry of interim and final orders (collectively, the "Borrowing Orders") to approve a credit agreement (the "DIP Loan Agreement") entered into by and between the Debtor and JB Holdings, Inc. (the "Lender"), as follows:

> a) pursuant to Sections 364(c)(1), (2) and (3) and §§503(b) and 507 of the Bankruptcy Code and Bankruptcy Rule 4001(c), authorizing, on an interim basis, the Debtor to obtain from the Lender post-petition financing in the form of $2.0 million loan (the "DIP Loan") pursuant to the terms of the DIP Loan Agreement, and granting the Lender superpriority administrative expense claim status pursuant to Sections 503(b) and 507 of the Bankruptcy Code and a lien on and security interest in substantially all of the assets of the Debtor all in accordance with the terms and conditions of the DIP Loan Agreement, junior only to Permitted Liens (as defined in the DIP Loan Agreement), and senior in all other respects;
>
> b) approving the terms and conditions of the DIP Loan Agreement and authorizing the Debtor to execute and deliver, from time to time, all such documents, instruments and agreements and perform such other acts as may be required,

grl/D295491v/F057848

necessary or desirable in connection with the DIP Loan Agreement including, without limitation, the payment of all fees, interest and charges required under the DIP Loan Agreement;

c) granting, pending a final hearing (the "Final Hearing"), authorization to borrow under the DIP Loan $250,000[2] (the "Interim Amount"), pursuant to an order in the form annexed hereto and made a part hereof as **Exhibit "A"** (the "Interim Order");

d) authorizing the Debtor, after entry of a Final Order (as defined below), to borrow up to the full amount of the DIP Loan in connection with the operations of its business;

e) modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to implement the terms and provisions of the DIP Loan Agreement and the provisions of the Borrowing Orders;

f) scheduling and approving the form and manner of notice of the Final Hearing to consider entry of a final order (the "Final Order") granting the relief sought herein on a permanent basis; and

g) granting the Debtor such further relief as is just and proper.

12. A copy of the DIP Loan Agreement is attached hereto as **Exhibit "B"**. The Debtor requests that the Court enter the Interim Order and schedule a hearing on entry of the Final Order for late December, 2009.

**JURISDICTION**

13. The Court has jurisdiction over this Application under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

14. On December 10, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for reorganization in accordance with Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of New York.

grl/D295491v/F057848

15. The Debtor is authorized to operate its business and manage its property as debtor-in-possession pursuant to Bankruptcy Code §§1107(a) and 1108. No trustee, examiner, or Committee of unsecured creditors has been appointed in this proceeding.

**PROPOSED DEBTOR-IN-POSSESSION FINANCING**

16. The Debtor's reorganization efforts hinge on access to adequate post-petition financing to maintain operations and provide member services so that the value of the Debtor's assets can be maximized. The Debtor is concerned that without DIP financing, there will be cash shortfalls within the Chapter 11 period. It is axiomatic that businesses such as the Debtor's require sufficient liquidity to satisfy their ongoing cash requirements to purchase materials, pay employees, pay utilities and to fund myriad other ordinary course day-to-day expenditures. Absent access to post-petition financing, the Debtor's current assets, cash and dues payments provide insufficient liquidity to satisfy such obligations in the ordinary course of business.

17. In addition, the Debtor's proposed Management Company, members, suppliers, vendors and other creditors are looking to the immediate approval of the DIP Loan for assurance that operations will continue and the bills will be paid on a continuous and timely basis. Similarly, the Debtor's employees will view the DIP Loan as necessary to ensure timely payment of payroll and other employee-related obligations. Just as the confidence of the members to pay their dues, the ongoing cooperation of suppliers, vendors and employees is critical if the Debtor is to continue to operate in an orderly and reasonable manner.

18. Without immediate access to credit pursuant to the proposed DIP Loan there would be a precipitous termination of the Debtor's business that would destroy the going-concern value of the Debtor's assets, resulting in immediate and irreparable harm to the

---

[2] In the event that the Final Hearing does not or cannot occur until after January 31, 2010, the Interim Amount will be increased to $400,000 consistent with the terms of the Letter of Intent.

Debtor's estate. Quite simply, the importance of the Debtor's immediate need for post-petition financing and use of cash collateral cannot be overstated.

19. The Debtor has determined, in the exercise of its considered business judgment, in consultation with its retained professionals, that it requires immediate use of borrowing under the DIP Loan up to $250,000.00 on an emergency basis and final authorization of the full DIP Loan thereafter. Such authorization will enable the Debtor to meet its immediate credit obligations and provide it with sufficient liquidity to continue operations to permit the equity investment sale process to be completed.

20. Due to the exigencies and the nature of the Debtor's business, the Debtor has determined that it is in its best interest to obtain post-petition financing from the Lender, which is the lending entity created by Bennardo for that purpose. Based on a review of comparable recent debtor-in-possession financing arrangements, the Debtor believes that the terms and conditions of the DIP Loan Agreement are reasonable under the circumstances. The Debtor has reviewed financial information for Bennardo and the Lender and believes that the Lender has the financial wherewithal to fund fully its lending commitments under the DIP Loan Agreement. The Debtor further believes that the DIP facility offered by JB Holdings is the best deal presently available to it. The Debtor will not have to pay all of the usual due diligence, origination and commitment fees associated with such financing. Indeed, the Debtor projects that the DIP Loan will improve its liquidity and help stabilize its operations until the reorganization process is completed, a result which the Debtor believes would not be possible except through the proposed DIP Loan. The Debtor is certain that it would not otherwise be able to obtain unsecured credit allowable under Section 503(b) (1) of the Bankruptcy Code as an administrative expense, or secured solely by liens and security interests junior to those of pre-petition creditors.

21. Pursuant to the DIP Loan, Lender has agreed to provide the Debtor with an immediate use of up to $250,000 of the DIP Loan, pending a final hearing. As could be

expected given the Debtor's current financial posture, Lender requires that the DIP Loan be (a) entitled to superiority administrative expense status pursuant to Section 364(c) of the Bankruptcy Code and otherwise over all administrative expenses of the kinds specified in Sections 105(a), 326, 328, 300, 331, 503(b), 506(c), 507, 546(c), 726 and 1114 of the Bankruptcy Code and (b) secured by liens with a priority status pursuant to Section 364(c)(3) on and security interests in substantially all of the Debtor's assets subject only to the Permitted Liens, include the lien of Time, and the Carve Out (as defined below).

22. A brief summary of certain of the key provisions of the DIP Loan follows below. The Court and parties-in-interest, however, are respectfully referred to the DIP Loan Agreement for a fill recitation of the terms and conditions of the DIP Loan.

| | |
|---|---|
| Borrowers: | The Woodcrest Club, Inc. |
| Lender: | JB Holdings, Inc. |
| Commitment Availability: | Loan of $2.0 million converting to exit financing to run through November 2014 for the following limited uses as set forth in the budget. |
| Priority and Liens: | All borrowings under the DIP Loan shall be:<br>(i) entitled to superiority administrative expense claim and lien status pursuant to Section 364(c)(1)(2) and (3) of the Bankruptcy Code, superior to any and all administrative expense of the Debtor, except for the Carve Out (as defined below); and (ii) by liens upon all now owned or hereafter acquired assets and property of the estates, real and personal, of the Debtor, junior to any Permitted Liens, but senior in all other respects, as set forth more fully in any borrowing orders, whether interim or final, and the DIP Loan Documents, (the "Collateral") and, in each case, subject to a carve out for Avoidance Claims under Chapter 5 of the Bankruptcy Code, United States Trustee fees under 28 U.S.C. § 1930, and any fees payable to the Clerk of the Court (the "Carve Out"). |
| Term: | The date that is the earliest to occur of (i) the closing date of a sale of the Property of the Debtor; (ii) the conversion of the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; (iii) the appointment of a trustee under Chapter 11 of the Bankruptcy Code; (iv) the appointment of an examiner with expanded powers under the Bankruptcy Code; (v) termination of the Management Agreement; or (vi) 5 years. |

| | |
|---|---|
| Conditions Precedent: | The availability of the total DIP Loan is conditioned upon satisfaction of usual and customary conditions precedent including, among other things, the following:<br><br>(i) entry of the Interim Order and the Final Order, each in form and substance satisfactory to the Lender in its sole discretion, which Borrowing Orders shall contain provisions granting the Lender liens pursuant to Sections 364(c)(1)(2) and (3), 503(b) and 507 of the Bankruptcy Code on the Collateral, junior to Permitted Liens, and senior in all other respects, and provide that its claim has the priority set forth under Sections 364(c)(1)(2) and (3) and 503(b) and 507(b) of the Bankruptcy Code over all administrative expenses incurred in these Chapter 11 cases, subject to the Carve Out, and (ii) the Court's approval of an interim management agreement in the form of the Letter of Intent.; |
| Fees and Expenses: | No upfront, commitment fees or expenses shall be paid by the Debtor in connection with the DIP Loan, except for the Lender's attorneys' fees and costs. The Lender has agreed to waive customary fees. |
| Interest Rate: | Ten (10%) per annum. |
| Representations, Warranties, Covenants And Events of Default: | Similar to those customary in credit facilities of this nature plus the termination of the Management Agreement, Interim or Final. |
| Modification of Automatic Stay and Notice Periods: | The DIP Loan provides for a modification of the automatic stay to allow the Lender to exercise certain remedies upon five (5) business days to notice the Debtor, its counsel, counsel for any official committee and the U.S. Trustee, in the event of a default under the Borrowing Orders or an Event of Default under the DIP Loan Agreement. |

23. The Debtor believes that the terms of the DIP Loan Agreement are reasonable and fair under the circumstances and, therefore, obtaining the DIP Loan serves the best interests of the Debtor, its creditors and its estate.

**BASIS FOR APPROVAL OF THE DIP FACILITY
AND THE GRANTING OF LIENS AND SUPERIORITY
<u>ADMINISTRATIVE CLAIMS IN CONNECTION THEREWITH</u>**

24. Section 364 of the Bankruptcy Code authorizes this Court to allow the Debtor to obtain post-petition financing from the Lender in the manner proposed in the DIP Loan Agreement. As described above, as security for all borrowings under the DIP Loan, the Debtor proposes to grant Lender a superiority administrative claim and a lien on and security in all or

substantially all of the Debtor's assets, junior to the Permitted Liens, and senior in all other respects, other then the Carve Out. Such relief is authorized pursuant to Sections 364(c)(1)(2) and (3), 503(b) and 507 of the Bankruptcy Code.

25. The granting of superiority administrative credit is allowable under Section 364(c) of this Bankruptcy Code which provides:

> If the trustee is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring debt –
>
> (1) with priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of this title;
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

### REQUEST FOR IMMEDIATE BORROWINGS AND USE OF CASH COLLATERAL ARE NECESSARY TO AVOID IRREPARABLE HARM

26. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a minimum of 15 days' notice is required before a final hearing on this Application may commence. However, such Rule provides that the Court may conduct a hearing before such 15 day period expires, and may authorize the obtaining of credit and the use of only that amount of cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Federal R. Bankr.P.4001 (c)(2).

27. As stated above, it is essential to the continued operation of its business that the Debtor be authorized by this Court to obtain interim financing and use of cash collateral on an interim basis as set forth herein pending the final hearing on the Application. Funds are urgently needed to meet all of the Debtor's working capital needs, and to preserve the value of the assets of the Debtor. In the absence of immediate post-petition financing and the use of cash

grl/D295491v/F057848

collateral, the Debtor's attempts to maximize its value for creditors would be immediately and irreparably jeopardized.

28. The Debtor believes that the terms and conditions of the DIP Loan Agreement represent the most favorable option for post-petition financing and for all of the foregoing reasons, are in the best interest of the Debtor, its estate and its creditors. Accordingly, the Debtor respectfully requests that, pending a final hearing on the Application, the terms and provisions of the DIP Loan Agreement be implemented and approved on an emergency interim basis, to the extent of authorizing the Debtor to obtain interim post-petition financing under the DIP Loan Agreement in an aggregate amount not to exceed $250,000, on the terms and subject to the conditions set forth in the DIP Loan Agreement.

29. Debtor further submits that the terms and conditions of the DIP Loan Agreement are fair and reasonable and are the result of arms' length negotiations between the Debtor and Lender. The Lender has even waived many of the customary fees and expenses that one would otherwise assume would be elements of a DIP transaction. Accordingly, the Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the DIP Loan.

30. As is apparent from the foregoing, the interim relief requested in this Application, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtor, its estate and its creditors.

### **NOTICE WITH RESPECT TO THE INTERIM ORDER**

31. The Debtor will provide notice by electronic transmission, hand delivery or overnight mail of this Application pursuant to Bankruptcy Rule 4001 to (a) the Office of the United States Trustee, (b) attorneys for the Lender, (c) the Debtor's secured creditors, and (d) and any other parties requesting such notice. The Debtor respectfully submits that such notice is sufficient and requests that this Court find that no further notice of the relief requested herein is required.

grl/D295491v/F057848

## **NOTICE WITH RESPECT TO THE FINAL ORDER**

32. The Debtor also proposes to serve a copy of the Interim Order and this Application (together with exhibits) by hand delivery or overnight mail, within two (2) days after entry of the Interim Order, upon (a) the Office of the United States Trustee, (b) White and Williams LLP, attorneys for the Lender, (c) the Debtor's secured creditors, and, by first class mail, on (d) the District Director for the Internal Revenue Service, (e) all parties that have filed notices of appearances and requests for notices of appearances and requests for notices in the Debtor's chapter 11 case, and Notice of the Interim Order by first class mail on (g) all of the Debtor's remaining creditors. The Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the Interim Order, the Final Hearing, the Final Order and all proceedings to be held in connection therewith is required.

33. The Debtor intends to seek final approval of the Letter of Intent as its interim management agreement with Legacy at the final hearing on this Application.

34. This Application cites relevant legal authority and raises no novel issues of law. Thus, the Debtor respectfully submits that this Motion complies with Local Bankruptcy Rule 9013-1(a).

35. No previous application for the relief sought herein has been made to this or any other Court.

grl/D295491v/F057848

**WHEREFORE,** the Debtor respectfully requests that the Court (1) enter the Interim Order authorizing Debtor, to obtain financing pursuant to the DIP Loan on an interim basis through the conclusion of the Final Hearing on the terms set forth herein and the DIP Loan Agreement; (2) enter the Final Order authorizing Debtor to obtain financing under the DIP Loan on the terms set forth herein and in the DIP Loan Agreement; and (3) grant such further relief as is just and proper.

Dated: Jericho, New York  
     December 10, 2009

THE WOODCREST CLUB, INC.  
Debtor and Debtor-in-Possession

By its Attorneys,  
SilvermanAcampora LLP

By:    s/Gerard R. Luckman  
Gerard R. Luckman  
A Member of the Firm  
100 Jericho Quadrangle, Suite 300  
Jericho, New York 11753  
(516) 479-6300